UNITED STATES, Appellee

v.

Eric P. MARCUM, Technical Sergeant
U.S. Air Force, Appellant

No. 02-0944

Crim. App. No. 34216

United States Court of Appeals for the Armed Forces

Argued October 7, 2003

Decided August 23, 2004

BAKER, J., delivered the opinion of the Court, in which
GIERKE, EFFRON, AND ERDMANN, JJ., joined.  CRAWFORD, C.J., filed
a separate opinion concurring in the result in part and
dissenting in part.

<u>Counsel</u>

For Appellant: <u>Frank J. Spinner, Esq.</u> (argued); <u>Colonel Beverly
B. Knott</u>, <u>Major Terry L. McElyea</u>, and <u>Captain Jennifer K.
Martwick</u> (on brief).

For Appellee: <u>Colonel LeEllen Coacher</u> (argued); <u>Major Jennifer
R. Rider</u> and <u>Lieutenant Colonel Lance B. Sigmon</u> (on brief);
<u>Lieutenant Colonel Robert V. Combs</u> and <u>Captain C. Taylor Smith</u>.

Amici Curiae for Appellant:  <u>Stuart F. Delery, Esq.</u> (argued);
<u>Josh Goldfoot, Esq.</u> and <u>Alison J. Nathan, Esq.</u> (on brief) — for
The American Civil Liberties Union, et. al.  <u>Eugene R. Fidell,
Esq.</u> (on brief) — for Social Scientists and Military Experts.

Amicus Curiae for Appellee:  <u>Colonel Lauren B. Leeker</u>,
<u>Lieutenant Colonel Margaret B. Baines</u>, <u>Captain Matthew J.
MacLean</u> (on brief) — for the United States Army, Government
Appellate Division.

Military Judge: S. A. Gabrial

<u>**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**</u>.

United States v. Marcum, No. 02-0944/AF

Judge BAKER delivered the opinion of the Court.

Contrary to his pleas, Appellant was convicted by officer members of dereliction of duty by providing alcohol to individuals under the age of 21, non-forcible sodomy, forcible sodomy, assault consummated by a battery, indecent assault, and three specifications of committing indecent acts in violation of Articles 92, 125, 128, and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 892, 925, 928, and 934 (2000), respectively. Appellant was sentenced to confinement for 10 years, a dishonorable discharge, total forfeitures, and reduction to the lowest enlisted grade. The convening authority reduced the confinement to six years, but otherwise approved the findings and sentence.

The case was reviewed by the Air Force Court of Criminal Appeals, which affirmed the findings and sentence. United States v. Marcum, No. ACM 34216, slip op. (A.F. Ct. Crim. App. July 25, 2002). This Court granted review of the following issues:

## ISSUE I

WHETHER APPELLANT SUFFERED PREJUDICIAL ERROR WHEN HIS TRIAL DEFENSE COUNSEL REVEALED PRIVILEGED COMMUNICATIONS WITHOUT APPELLANT'S PERMISSION DURING THE SENTENCING PHASE OF APPELLANT'S TRIAL IN VIOLATION OF M.R.E. 502 AND 511.

2

## ISSUE II

WHETHER THE MILITARY JUDGE ERRED BY INSTRUCTING THE PANEL THAT THE MAXIMUM SENTENCE IN APPELLANT'S CASE WAS LIFE WITHOUT PAROLE WHEN THE PRESIDENT HAD NOT AUTHORIZED THAT PUNISHMENT FOR APPELLANT'S OFFENSES.

## ISSUE III

WHETHER APPELLANT'S CONVICTION FOR VIOLATING ARTICLE 125, UCMJ, BY ENGAGING IN CONSENSUAL SODOMY (CHARGE II, SPECIFICATION 1) MUST BE SET ASIDE IN LIGHT OF THE UNITED STATES SUPREME COURT'S HOLDING IN LAWRENCE V. TEXAS, 123 S.CT. 2472 (2003).


Addressing these issues out of order, we hold that Article 125, UCMJ, is constitutional as applied to Appellant.

Constitutional rights generally apply to members of the armed forces unless by their express terms, or the express language of the Constitution, they are inapplicable. However, Appellant's actions in the military context fell outside the zone of autonomy identified by the Supreme Court as a protected liberty interest. Among other things, Appellant was convicted of non-forcible sodomy with a subordinate airman within his chain of command. An Air Force instruction prohibits such sexual conduct between servicemembers in differing pay-grades and within the same chain of command. This instruction provides for potential criminal sanctions through operation of Article 92. This instruction evidences that Senior Airman H, Appellant's subordinate, was in a military position where

3

"consent might not easily be refused." Lawrence v. Texas, 539 U.S. 558, 578 (2003).

Civilian defense counsel violated Military Rule of Evidence 502 [hereinafter M.R.E.] when he submitted a twenty-page pre-trial statement as a sentencing exhibit without Appellant's consent. This statement was prepared by Appellant for his defense counsel to use in preparation for trial. The statement depicts in graphic detail Appellant's sexual encounters with six members of his Air Force unit. Although Appellant's trial testimony recounted much of the same information contained within the statement, we conclude that the timing, tone, and graphic substance of this privileged communication prejudiced Appellant during sentencing.

In light of our decision on Issue I, we need not decide whether life without parole was an authorized punishment for forcible sodomy at the time of Appellant's offenses. As a result, we affirm with respect to the findings, but reverse with respect to the sentence.

## I. Issue III Article 125

### Facts

Appellant, a cryptologic linguist, technical sergeant (E-6), and the supervising noncommissioned officer in a flight of Persian-Farsi speaking intelligence analysts, was stationed at Offutt Air Force Base, Nebraska. His duties included training

4

and supervising airmen newly assigned to the Operations Training Flight.

While off-duty Appellant socialized with airmen from his flight at parties. According to the testimony of multiple members of his unit, airmen "often" spent the night at Appellant's off-base home following these parties. The charges in this case resulted from allegations by some of these subordinate airmen that Appellant engaged in consensual and nonconsensual sexual activity with them.

Among other offenses, Appellant was charged with the forcible sodomy of Senior Airman (SrA) (E-4). Specifically, Specification 1 of Charge II alleged that Appellant "did, at or near Omaha, Nebraska, between on or about 1 September 1998 and on or about 16 October 1998, commit sodomy with Senior Airman H by force and without consent of the said Senior Airman H."

With regard to the charged offense, SrA H testified that after a night of drinking with Appellant he stayed at Appellant's apartment and slept on the couch. SrA H further testified that at some point he woke up to find Appellant orally sodomizing him. Although Appellant testified that he "did not perform oral sex on [SrA H] at all," he testified to "kissing [SrA H] penis twice." When asked "did you, at any time, use any force, coercion, pressure,

5

intimidation or violence?" Appellant responded, "No, sir, I did not and neither did Airman H." Moreover, Appellant testified that the activity that occurred between Appellant and SrA H was "equally participatory."

According to SrA H's testimony, he did not say anything to Appellant at the time of the charged incident, but grabbed the covers, pulled them up over his torso, and turned away from Appellant into the couch. SrA H left the apartment soon after this incident took place. SrA H testified that he didn't protest at the time because he didn't know how Appellant would react. SrA H also testified that Appellant's actions made him scared, angry, and uncomfortable.

According to SrA H, he later confronted Appellant about this incident. He told Appellant, "I just want to make it clear between us that this sort of thing doesn't ever happen again." Nevertheless, SrA H forgave Appellant and continued their friendship. SrA H testified that he considered his relationship with Appellant like that of "a father type son relationship or big brother, little brother type relationship[.]" Subsequent to this incident, SrA H explained how he and Appellant salsa danced together and kissed each other in the "European custom of men." SrA H also told Appellant that he loved him, bought him a t-shirt as a

6

souvenir, and sent numerous e-mails to Appellant expressing his continued friendship.

Appellant and SrA H also provided testimony regarding an incident that occurred prior to the charged offense. SrA H testified that during the incident he woke up in the morning and he was on top of Appellant with his face near Appellant's stomach. Appellant testified, "I was laying on my side, actually almost on top of the couch, with my belly on the couch but turned a little bit like this towards, with my face towards the rest of the living room. Airman H was [on] top of me with, facing me. Airman H was moving his pelvis area against my butt which is what woke me up. He had an erection, he had his arm around me, around the part that was actually touching the couch."

At the time of the charged conduct in question, Appellant and SrA H were both subject to Dep't of the Air Force, Instruction 36-2909 (May 1, 1996). This instruction addresses professional and unprofessional relationships within the Air Force. Dep't of the Air Force, Instruction 36-2909 is subject to criminal sanction through operation of Article 92 (Failure to obey order or regulation). Although this instruction was not admitted into evidence at trial, Appellant admitted during cross-examination that he was "aware of an Air Force policy" and

that through his actions he had "broken more than an Air Force policy."

A panel of officers and enlisted members found Appellant "not guilty of forcible sodomy but guilty of non-forcible sodomy" in violation of Article 125.  He was convicted on May 21, 2000.  The convening authority approved his sentence except for the term of confinement on September 6, 2000.

Subsequent to the trial, action by the convening authority, and the Air Force Court of Criminal Appeals' review in this case, the Supreme Court granted certiorari in Lawrence v. Texas, a case challenging the constitutionality of a Texas statute criminalizing same sex sodomy.  Lawrence was argued on March 26, 2003, and decided on June 26, 2003.  Appellant petitioned this Court for review on September 23, 2002.  This Court granted his petition on March 10, 2003.  Appellant's supplemental issue regarding the Supreme Court's ruling in Lawrence was granted by this Court on August 29, 2003.

### Discussion

### A.    Article 125 Text

Article 125 states:

(a)    Any person subject to this chapter who engages in unnatural carnal copulation with another person of the same or opposite sex or with an animal is guilty of sodomy.  Penetration, however slight, is sufficient to complete the offense.

    (b)      Any person found guilty of sodomy shall be punished as a court-martial may direct.

As we stated in United States v. Scoby,

> By its terms, Article 125 prohibits every kind of unnatural carnal intercourse, whether accomplished by force or fraud, or with consent. Similarly, the article does not distinguish between an act committed in the privacy of one's home, with no person present other than the sexual partner, and the same act committed in a public place in front of a group of strangers, who fully apprehend in the nature of the act.

5 M.J. 160, 163 (C.M.A. 1978). Thus, Article 125 forbids sodomy whether it is consensual or forcible, heterosexual or homosexual, public or private.

## B. Arguments

Appellant challenges his conviction on the ground that Lawrence recognized a constitutional liberty interest in sexual intimacy between consenting adults in private. Appellant argues that Article 125 suffers from the same constitutional deficiencies as the Texas statute in Lawrence because both statutes criminalize private consensual acts of sodomy between adults. Appellant further contends that in light of the Supreme Court's rejection of Bowers v. Hardwick, 478 U.S. 186 (1986), Appellant's conviction violates the Due Process Clause. As a result, Appellant argues that Article 125 is either unconstitutional on its face or unconstitutional as applied to his conduct.

9

The amici curiae,[*] arguing in support of Appellant's position, assert that Article 125 is unconstitutional on its face. According to the amici, the Supreme Court placed Lawrence within its privacy line of jurisprudence by overruling Bowers and effectively deciding that private, consensual, sexual conduct, including sodomy, is a constitutionally protected liberty interest. See Lawrence, 539 U.S. at 577. As with other fundamental rights, the amici contend that a statute purporting to criminalize a fundamental right must be narrowly tailored to accomplish a compelling government interest. The amici argue that Article 125 is not narrowly tailored because it reaches, among other conduct, the private, consensual, off-base, intimate activity of married military persons and their civilian spouses. Arguing in the alternative, quoting Lawrence, the amici do not "dispute that the interests in good order and discipline, and in national security, are important. But the importance of those interests is irrelevant, because there is simply no basis to conclude that they are even rationally related to Article 125, let alone sufficiently advanced by that law to justify its onerous burdens on the 'full right' to engage in 'conduct

---

[*] The amici curiae referred to in this opinion are represented in the Brief of Amici Curiae in support of Appellant on behalf of the American Civil Liberties Union, the American Civil Liberties Union of the National Capital Area, Lambda Legal Defense and Education Fund, Servicemembers Legal Defense Network, and Retired Members of the Military.

protected by the substantive guarantee of liberty.'" Under both arguments, the amici maintain that the government has no legitimate or compelling military interest in regulating Appellant's private conduct.

The Government argues that Lawrence is not applicable in the military environment due to the distinct and separate character of military life from civilian life as recognized by the Supreme Court in Parker v. Levy, 417 U.S. 733 (1974). The Government further argues that because the Supreme Court did not expressly state that engaging in homosexual sodomy is a fundamental right, this Court should analyze Article 125 using the rational basis standard of review. Utilizing this standard, the Government contends Article 125 is constitutional because it is rationally related to a legitimate state interest. Specifically, the Government maintains that Article 125 criminalizes conduct that "create[s] an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion" within the military as recognized by Congress in 10 U.S.C. § 654(a)(15).

Whether Appellant's conviction must be set aside in light of the Supreme Court's holding in Lawrence is a constitutional question reviewed de novo. Jacobellis v. Ohio, 378 U.S. 184, 190 (1964).

C.   The Lawrence Decision

11

United States v. Marcum, No. 02-0944/AF

The petitioners in Lawrence challenged the constitutionality of a Texas statute criminalizing same sex sodomy. See 539 U.S. at 562. This statute provided that "[a] person commits an offense if he engages in deviate sexual intercourse with another individual of the same sex." Id. at 563 (quoting Texas Penal Code Ann. § 21.061(a) (2003)). The Supreme Court determined at the outset that the statute posed a question of substantive due process: "whether the petitioners were free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." Id. at 564. The "pertinent beginning point" for its review, the Supreme Court stated, was Griswold v. Connecticut, 381 U.S. 479 (1965). Id. Griswold addressed the right to a marital zone of privacy in the context of a Connecticut law proscribing the use of contraception and counseling regarding contraception. See 381 U.S. at 482. This liberty interest was subsequently extended outside the marital context in Eisenstadt v. Baird, 405 U.S. 438 (1972)(right of individuals, married or unmarried, to have access to contraceptives) and Carey v. Population Services Int'l, 431 U.S. 678 (1977)(right to distribute contraception). See Lawrence, 539 U.S. at 565-66.

Having framed the question as one of liberty, the Supreme Court indicated that "[t]o say that the issue in Bowers was

12

simply the right to engage in certain sexual conduct demeans the claim the individual put forward[.]" Id. at 567.  The Supreme Court also characterized the statutes in Bowers and Lawrence as seeking

> to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals.
>
> This, as a general rule, should counsel against attempts by the State, or a court, to define the meaning of the relationship or to set its boundaries absent injury to a person or abuse of an institution the law protects.

Id.

Within this framework the Supreme Court overruled Bowers: "The rationale of Bowers does not withstand careful analysis. . . . Bowers was not correct when it was decided, and it is not correct today.  It ought not to remain binding precedent."  Id. at 577-78.

With respect to the Lawrence petitioners, the Court stated:

> The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.  The petitioners are entitled to respect for their private lives.  The State cannot demean their existence or control their destiny by making their private sexual conduct a crime.  Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government.  "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter."  The Texas statute furthers no legitimate state

13

> interest which can justify its intrusion into the personal and private life of the individual.

Id. at 578 (citing Planned Parenthood v. Casey, 505 U.S. 833, 847 (1992)).

While finding the Texas statute unconstitutional, the Supreme Court stated that "[t]he present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution." Id. The Supreme Court did not expressly state whether or not this text represented an exhaustive or illustrative list of exceptions to the liberty interest identified, whether this text was intended to suggest areas where legislators might affirmatively legislate, or whether this text was intended to do no more than identify areas not addressed by the Court. Nor did the Supreme Court squarely place its analysis within a traditional framework for constitutional review.

(1) Standard of Constitutional Review

The amici, in their primary argument, contend that strict scrutiny should apply to this Court's review of Article 125 because the Article impinges on a fundamental constitutional liberty interest. This follows from the amici's conclusion that "the Supreme Court overruled Bowers . . ., and held the Texas

sodomy prohibition unconstitutional because the Due Process Clause of the Fourteenth Amendment protects a fundamental right of adults to make decisions regarding private, consensual sexual conduct, including sodomy." As a result, the amici maintain that Article 125 is unconstitutional because it is not narrowly tailored to achieve a compelling government interest.

In contrast, the Government contends the Supreme Court did not find a fundamental right to engage in homosexual sodomy by overruling Bowers because the Supreme Court applied the rational basis standard of review in Lawrence. "Rather, by applying a 'rational basis standard of review' to reach their determination that the Texas statute 'furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual,' the Supreme Court reaffirmed that the right to engage in homosexual sodomy is not a fundamental right."

Although particular sentences within the Supreme Court's opinion may be culled in support of the Government's argument, other sentences may be extracted to support Appellant's argument. On the one hand, the opinion incorporates some of the legal nomenclature typically associated with the rational basis standard of review. For example, as the Government notes, the Supreme Court declared "[t]he Texas statute furthers no legitimate state interest[.]" See Lawrence, 539 U.S. at 578.

15

This is the counter-weight applied in the rational basis analysis. Moreover, the Supreme Court did not apply the nomenclature associated with strict scrutiny, i.e., identification of a compelling state interest and narrow tailoring of the statute to accomplish that interest.

On the other hand, the Supreme Court placed Lawrence within its liberty line of cases resting on the Griswold foundation. See id. at 564-65. These cases treated aspects of liberty and privacy as fundamental rights, thereby, subjecting them to the compelling interest analysis. See Griswold, 381 U.S. at 485; Carey, 431 U.S. at 686. With regard to the Supreme Court's use of language attributed to the rational basis review, Appellant and the amici argue the Supreme Court is simply stating that the Texas statute does not even accomplish a legitimate interest, let alone a compelling one.

Indeed, in response to the Supreme Court's decision in Lawrence, some courts have applied the rational basis standard of review while other courts have applied strict scrutiny. For example, the Court of Appeals of Arizona determined that "the Court applied without explanation the rational basis test, rather than the strict scrutiny review utilized when fundamental rights are impinged, to hold the Texas statute unconstitutional." Standhardt v. Superior Court of Arizona, 77 P.3d 451, 457 (Ariz. Ct. App. 2003). Whereas the court in

16

Fields v. Palmdale School District, 271 F. Supp. 2d 1217, 1221 n. 7 (C.D. Cal. 2003), concluded, "Many of these fundamental rights, especially those relating to marital activities and family relationships, have been classified by the Supreme Court under a broader 'right to privacy' that is implicit in the Fourteenth Amendment[.]".

The focus by the Government and Appellant on the nature of the Supreme Court's constitutional test in Lawrence is understandable. Utilization of either the rational basis test or strict scrutiny might well prove dispositive of a facial challenge to Article 125. On the one hand, the interests in military readiness, combat effectiveness, or national security arguably would qualify as either rational or compelling governmental interests. On the other hand, it is less certain that Article 125 is narrowly tailored to accomplish these interests.

The Supreme Court did not expressly state which test it used. The Court did place the liberty interest in Lawrence within the Griswold line of cases. See Lawrence, 539 U.S. at 564-65. Griswold and Carey address fundamental rights. However, the Supreme Court has not determined that all liberty or privacy interests are fundamental rights. In Lawrence, the Court did not expressly identify the liberty interest as a fundamental right. Therefore, we will not presume the existence

of such a fundamental right in the military environment when the Supreme Court declined in the civilian context to expressly identify such a fundamental right.

What Lawrence requires is searching constitutional inquiry. This inquiry may require a court to go beyond a determination as to whether the activity at issue falls within column A — conduct of a nature to bring it within the liberty interest identified in Lawrence, or within column B — factors identified by the Supreme Court as outside its Lawrence analysis.  The Court's analysis reached beyond the immediate facts of the case presented.  This is reflected by the Court's decision to rule on the grounds of due process as opposed to equal protection. "Were we to hold the statute invalid under the Equal Protection Clause," the Supreme Court noted, "some might question whether a prohibition would be valid if drawn differently, say, to prohibit the conduct both between same-sex and different-sex participants."  539 U.S. at 575.  The Supreme Court also acknowledged "an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex."  Id. at 572.

At the same time the Court identified factors, which it did not delimit, that might place conduct outside the Lawrence zone of liberty.  Thus, the door is held open for lower courts to

18

address the scope and nature of the right identified in Lawrence, as well as its limitations, based on contexts and factors the Supreme Court may not have anticipated or chose not to address in Lawrence. In our view, this framework argues for contextual, as applied analysis, rather than facial review. This is particularly apparent in the military context.

(2) Lawrence in the Military Context

The Supreme Court and this Court have long recognized that "[m]en and women in the Armed Forces do not leave constitutional safeguards and judicial protection behind when they enter military service." United States v. Mitchell, 39 M.J. 131, 135 (C.M.A. 1994)(quoting Weiss v. United States, 510 U.S. 163, 194 (1994)(Ginsburg, J., concurring)). "Our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes." Goldman v. Weinberger, 475 U.S. 503, 507 (1986)(citations omitted). As a result, this Court has consistently applied the Bill of Rights to members of the Armed Forces, except in cases where the express terms of the Constitution make such application inapposite. See United States v. Jacoby, 11 C.M.A. 428, 430-31, 29 C.M.R. 244, 246-47 (1960)("[I]t is apparent that the protections in the Bill of Rights, except those which are expressly or by necessary implication inapplicable, are available to members of our armed forces.").

At the same time, these constitutional rights may apply differently to members of the armed forces than they do to civilians.  See Parker, 417 U.S. at 743.  "The military is, by necessity, a specialized society."  Id.  Thus, when considering how the First Amendment and Fourth Amendment apply in the military context, this Court has relied on Supreme Court civilian precedent, but has also specifically addressed contextual factors involving military life.  See United States v. Priest, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972)("[T]he right of free speech in the armed services is not unlimited and must be brought into balance with the paramount consideration of providing an effective fighting force for the defense of our Country."); see also United States v. McCarthy, 38 M.J. 398 (C.M.A. 1993)(warrantless entry into military barracks room to effectuate apprehension did not violate Fourth Amendment).  In light of the military mission, it is clear that servicemembers, as a general matter, do not share the same autonomy as civilians.  See Parker, 417 U.S. at 758.

While the Government does not contest the general proposition that the Constitution applies to members of the Armed Forces, it argues that Lawrence only applies to civilian conduct.  Moreover, with respect to the military, the Government contends that Congress definitively addressed homosexual sodomy by enacting 10 U.S.C. § 654 (2000).  According to the

20

Government, pursuant to Congress's Article I authority to make rules and regulations for the Armed Forces, Congress not only prohibited sodomy through Article 125, but with Article 125 as a backdrop, determined in 1993 through 10 U.S.C. § 654 that homosexuality, and, therefore, sodomy was incompatible with military service.  In enacting § 654, Congress determined that "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability."  10 U.S.C. § 654(a)(15).  Thus, according to the Government, this Court should apply traditional principles of deference to Congress's exercise of its Article I authority and not apply Lawrence to the military.

The military landscape, however, is less certain than the Government suggests.  The fog of constitutional law settles on separate and shared powers where neither Congress nor the Supreme Court has spoken authoritatively.  Congress has indeed exercised its Article I authority to address homosexual sodomy in the Armed Forces, but this occurred prior to the Supreme Court's constitutional decision and analysis in Lawrence and at a time when Bowers served as the operative constitutional backdrop.  Moreover, the Supreme Court did not accept the Government's present characterization of the right as one of

21

homosexual sodomy. The Court stated, "To say that the issue in Bowers was simply the right to engage in certain sexual conduct demeans the claim the individual put forward[.]" Lawrence, 539 U.S. at 567. "The State cannot demean their existence or control their destiny by making their private sexual conduct a crime." Id. at 578. Nor did the Supreme Court define the liberty interest in Lawrence in a manner that on its face would preclude its application to military members.

Constitutional rights identified by the Supreme Court generally apply to members of the military unless by text or scope they are plainly inapplicable. Therefore, we consider the application of Lawrence to Appellant's conduct. However, we conclude that its application must be addressed in context and not through a facial challenge to Article 125. This view is consistent with the principle that facial challenges to criminal statutes are "best when infrequent" and are "especially to be discouraged." Sabri v. United States, ___ U.S. __, __, 124 S. Ct. 1941, 1948 (2004). In the military setting, as this case demonstrates, an understanding of military culture and mission cautions against sweeping constitutional pronouncements that may not account for the nuance of military life. This conclusion is also supported by this Court's general practice of addressing constitutional questions on an as applied basis where national security and constitutional rights are both paramount interests.

22

Further, because Article 125 addresses both forcible and non-forcible sodomy, a facial challenge reaches too far. Clearly, the Lawrence analysis is not at issue with respect to forcible sodomy.

Thus, this case presents itself to us as a challenge to a discrete criminal conviction based on a discrete set of facts. The question this Court must ask is whether Article 125 is constitutional as applied to Appellant's conduct. This as-applied analysis requires consideration of three questions. First, was the conduct that the accused was found guilty of committing of a nature to bring it within the liberty interest identified by the Supreme Court? Second, did the conduct encompass any behavior or factors identified by the Supreme Court as outside the analysis in Lawrence? 539 U.S. at 578. Third, are there additional factors relevant solely in the military environment that affect the nature and reach of the Lawrence liberty interest?

D.   Is Article 125 Constitutional as Applied to Appellant?

Appellant was charged with dereliction of duty, three specifications of forcible sodomy, three specifications of indecent assault, and two specifications of committing an indecent act. With regard to the charge addressed on appeal, the members found Appellant "not guilty of forcible sodomy, but guilty of non-forcible sodomy." As part of Appellant's

23

contested trial, the following additional facts surrounding his conduct were elicited:  The act of sodomy occurred in Appellant's off-base apartment during off-duty hours; no other members of the military were present at the time of the conduct; Appellant was an E-6 and the supervising noncommissioned officer in his flight.  His duties included training and supervising airmen.  SrA H, an E-4, was one of the airmen Appellant supervised.  As a result, SrA H was subordinate to, and directly within, Appellant's chain of command.

The first question we ask is whether Appellant's conduct was of a nature to bring it within the Lawrence liberty interest.  Namely, did Appellant's conduct involve private, consensual sexual activity between adults?  In the present case, the members determined Appellant engaged in non-forcible sodomy.  This sodomy occurred off-base in Appellant's apartment and it occurred in private.  We will assume without deciding that the jury verdict of non-forcible sodomy in this case satisfies the first question of our as applied analysis.

The second question we ask is whether Appellant's conduct nonetheless encompassed any of the behavior or factors that were identified by the Supreme Court as not involved in Lawrence. For instance, did the conduct involve minors?  Did it involve public conduct or prostitution?  Did it involve persons who

might be injured or coerced or who are situated in relationships where consent might not easily be refused?  See id.

When evaluating whether Appellant's conduct involved persons who might be injured or coerced or who were situated in relationships where consent might not easily be refused, the nuance of military life is significant.  An Air Force instruction applicable to Appellant at the time of the offenses included the following proscriptions.

> Unduly familiar relationships between members in which one member exercises supervisory or command authority over the other can easily be or become unprofessional.  Similarly, as differences in grade increase, even in the absence of a command or supervisory relationship, there may be more risk that the relationship will be, or be perceived to be unprofessional because senior members in military organizations normally exercise authority or some direct or indirect organizational influence over more junior members.

> Relationships are unprofessional, whether pursued on or off-duty, when they detract from the authority of superiors or result in, or reasonably create the appearance of, favoritism, misuse of office or position, or the abandonment of organizational goals for personal interests.

Dep't. of the Air Force Instruction, 36-2909 Professional and Unprofessional Relationships, paras. 2.2, 3.1 (May 1, 1996).

For these reasons, the military has consistently regulated relationships between servicemembers based on certain differences in grade in an effort to avoid partiality, preferential treatment, and the improper use of one's rank.  See United States v. McCreight, 43 M.J. 483, 485 (C.A.A.F. 1996).

25

Indeed, Dep't of the Air Force Instruction 36-2909 is subject to criminal sanction through operation of Article 92, UCMJ. As both the Supreme Court and this Court have recognized elsewhere, "The fundamental necessity for obedience and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." Parker, 417 U.S. at 758. While servicemembers clearly retain a liberty interest to engage in certain intimate sexual conduct, "this right must be tempered in a military setting based on the mission of the military, the need for obedience of orders, and civilian supremacy." United States v. Brown, 45 M.J. 389, 397 (C.A.A.F. 1996).

In light of Air Force Instructions at the time, Appellant might have been charged with a violation of Article 92 for failure to follow a lawful order. However, the Government chose to proceed under Article 125. Nonetheless, the fact that Appellant's conduct might have violated Article 92 informs our analysis as to whether Appellant's conduct fell within the Lawrence zone of liberty.

As the supervising noncommissioned officer, Appellant was in a position of responsibility and command within his unit with respect to his fellow airmen. He supervised and rated SrA H. Appellant also testified that he knew he should not engage in a sexual relationship with someone he supervised.

26

Under such circumstances, which Appellant acknowledged was prohibited by Air Force policy, SrA H, a subordinate airman within Appellant's chain of command, was a person "who might be coerced" or who was "situated in [a] relationship[] where consent might not easily be refused." Lawrence, 539 U.S. at 578. Thus, based on this factor, Appellant's conduct fell outside the liberty interest identified by the Supreme Court. As a result, we need not consider the third step in our Lawrence analysis. Nor, given our determination that Appellant's conduct fell outside the liberty interest identified in Lawrence, need we decide what impact, if any, 10 U.S.C. § 654 would have on the constitutionality of Article 125 as applied in other settings.

Appellant's conduct was outside the protected liberty interest recognized in Lawrence; it also was contrary to Article 125. As a result, Article 125 is constitutional as applied to Appellant.

## II. Issue I: Sentencing Statement

### Facts

After the court members announced their findings, the court-martial recessed for the evening. Appellant then went absent without leave (AWOL). After numerous recesses, the court-martial reconvened and proceeded without Appellant. See Rule for Courts-Martial 804(b)(1) [hereinafter R.C.M.]. Trial defense counsel objected to proceeding without Appellant, but

27

ultimately made a sentencing argument to members that included, as a sentencing exhibit, an unsworn statement from Appellant.

The unsworn statement was a compilation of word processed notes that Appellant had prepared for his defense counsel prior to trial. Appellant submitted an affidavit stating, "I have examined this document and believe it is covered by the attorney-client privilege, which I hereby invoke. At no time did I authorize my defense counsel to release it to anyone, in court or out of court. It was prepared for their eyes exclusively. They never asked me for permission to release it or permission to offer it as an unsworn statement in court." Marcum, No. ACM 34216, slip op at 4.

This twenty-page single spaced document was divided into six sections. Each section referenced a different male airman with whom Appellant was alleged to have had sexual contact. The document described for his lawyer the nature of his professional and off-duty relationship with each airman, including details regarding Appellant's level of attraction for each individual airman as well as graphic descriptions of the charged and uncharged sexual contact between Appellant and each airman.

The introduction of this statement caused the military judge to ask defense counsel, "I just want to make sure that that's the means by which you would like to present that to the court members and you're not interested in providing that in any

other fashion.  Is that correct?"  Civilian defense counsel responded:  "That's correct, Your Honor.  It is rather lengthy and I believe the impact of the contents of this statement, when each member of the court is provided a copy of this and they can read it individually, I think that it will carry the impact that it was intended to take."  In subsequent argument, civilian defense counsel made no reference to the unsworn statement, whereas trial counsel referred to the statement when arguing about Appellant's lack of contrition.

Appellant maintains that because he was absent from the proceedings he did not have the opportunity to assert his attorney-client privilege prior to defense counsel offering the written summary as an unsworn statement.  Appellant also argues that even if the unsworn statement was intended to benefit him, defense counsel had no basis to unilaterally waive the attorney-client privilege.  Therefore, Appellant contends that M.R.E. 502 and 511 were violated because he never waived the attorney-client privilege nor authorized his defense counsel to utilize the written summary.

The Government asserts that Appellant was not denied the opportunity to assert his attorney-client privilege because Appellant waived this opportunity by going absent without leave.  As a result, the Government contends that defense counsel was implicitly authorized to disclose the written summary.  The

Government also suggests that Appellant's unsworn statement does not fall under the exclusionary rule set forth in M.R.E. 511(a) because defense counsel introduced the statement on Appellant's behalf. Finally, the Government argues Appellant waived any privilege that might have existed with regard to the written summary when he testified to its contents during the defense's case.

## Discussion

Whether Appellant suffered prejudicial error when his trial defense counsel revealed a privileged communication during the sentencing phase of trial is a mixed question of law and fact reviewed de novo. United States v. Ankeny, 30 M.J. 10, 10 (C.M.A. 1990).

"Evidence of a statement or other disclosure of privileged matter is not admissible against the holder of the privilege if disclosure was compelled erroneously or was made without an opportunity for the holder of the privilege to claim the privilege." M.R.E. 511(a). "[E]vidence of such a communication should not be received unless it appears that the privilege has been waived by the person or government entitled to the benefit of it or that the evidence comes from a person or source not bound by the privilege." Ankeny, 30 M.J. at 19 (quoting Manual for Courts-Martial, United States, 1969, para. 151a (Rev. ed.)). "A lawyer shall not reveal information relating to the

30

representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure [is otherwise permitted by this rule.]" United States v. Dorman, 58 M.J. 295, 298 (C.A.A.F. 2003)(quoting Model Rules of Prof'l Conduct R. 1.6(a) (2003)(emphasis added)).

Military law is clear that the decision to make an unsworn statement is personal to the accused. During the sentencing proceedings, an accused may "testify, make an unsworn statement, or both in extenuation, in mitigation or to rebut matters presented by the prosecution[.]" R.C.M. 1001(c)(2)(A). If an accused chooses to make an unsworn statement, he "may not be cross-examined by the trial counsel upon it or examined upon it by the court-martial. . . . The unsworn statement may be oral, written, or both, and may be made by the accused, by counsel, or both." R.C.M. 1001(c)(2)(C). This "right of allocution by a military member convicted of a criminal offense is a fundamental precept of military justice." United States v. Provost, 32 M.J. 98, 99 (C.M.A. 1991).

Because an "accused's right to make an unsworn statement 'is a valuable right . . . [that has] long been recognized by military custom' and that has been 'generally considered unrestricted,'" United States v. Grill, 48 M.J. 131, 132 (C.A.A.F. 1998)(citing United States v. Rosato, 32 M.J. 93, 96

(C.M.A. 1991)), this Court will "not allow it to be undercut or eroded," United States v. Partyka, 30 M.J. 242, 246 (C.M.A. 1990). As this Court has previously indicated, "an accused elects to make an unsworn statement." Rosato, 32 M.J at 99. Thus, regardless of whether the unsworn statement is made by the accused or presented for the accused by his counsel, the right to make the unsworn statement is personal to the accused.

Therefore, if an accused is absent without leave his right to make an unsworn statement is forfeited unless prior to his absence he authorized his counsel to make a specific statement on his behalf. Although defense counsel may refer to evidence presented at trial during his sentencing argument, he may not offer an unsworn statement containing material subject to the attorney-client privilege without waiver of the privilege by his client.

Even though Appellant waived his right to be present during sentencing by being voluntarily absent, he did not waive his attorney-client privilege. Appellant's affidavit demonstrates that defense counsel never asked Appellant for permission to use the written summary. Thus, by submitting Appellant's written summary as an unsworn statement, defense counsel revealed material subject to the attorney-client privilege without receiving an appropriate waiver of this privilege from Appellant.

The harder question in this case, however, is whether Appellant waived his right to confidentiality through his trial testimony. If Appellant did not waive his right to confidentiality, this Court must decide whether Appellant was prejudiced by the use of the statement even though Appellant testified to a great deal of the information contained within the statement. "A finding or sentence of court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of an accused." Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000). Appellant contends the admission of his written summary prejudiced him during sentencing because it inflamed the members and resulted in a more severe sentence than he might have otherwise received. Moreover, Appellant suggests that if he had prepared an unsworn statement for sentencing it would have been different than what was ultimately presented by his defense counsel.

We believe Appellant has carried his burden on both counts. Throughout the written summary, Appellant graphically described the circumstances surrounding his relationships with the victims and denied responsibility for his actions. Within his description, Appellant provided numerous sexually explicit details not contained in his trial testimony, as well as, comments critical of the victims. Although Appellant's trial

33

testimony was graphic, the tone and substance of the sentencing statement was more explicit.

Moreover, trial counsel repeatedly referred to Appellant's unsworn statement during his sentencing argument. Trial counsel argued, "They are the victims. And when you read Sergeant Marcum's statement remember that. And when you see - when you read how he attacks the people that came forward to tell what he did, you remember and ask yourself, who is the professional in this case? Sergeant Marcum victimizes those airmen once and then through the testimony and through the statement that you have, he is victimizing those airmen again. Pay special attention to his comments concerning Airman [M]." Further, trial counsel reminded the members, "As you will read in Sergeant Marcum's statement, he can't even admit to what he has done." Defense counsel did not refer to the statement at all during his sentencing argument.

Under these circumstances, we find that Appellant did not waive his right to confidentiality through his trial testimony. Further, Appellant was prejudiced when his trial defense counsel revealed privileged communications during sentencing without Appellant's permission.

## Issue II:  Life Without Parole

Appellant's sentencing occurred on May 24, 2000.  The military judge instructed the members that life without parole was the maximum authorized punishment for Appellant's offenses. Appellant was subsequently convicted of various offenses, including non-forcible sodomy, for which the maximum authorized confinement was five years.  Appellant's approved sentence included, inter alia, a term of confinement for six years.  In light of our decision on Issue I, we need not decide whether life without parole was an authorized punishment for forcible sodomy at the time of Appellant's offenses.

## Decision

The decision of the United States Air Force Court of Criminal Appeals is affirmed with respect to the findings, but reversed with respect to the sentence.  The sentence is set aside.  The record of trial is returned to the Judge Advocate General of the Air Force.  A rehearing on sentence is authorized.

United States v. Marcum, No. 02-0944/AF

CRAWFORD, Chief Judge (dissenting on Issue I and concurring in result on Issue III):

I.  Defense Counsel's Release of Appellant's Unsworn Written Statement

I disagree with the majority's conclusion that defense counsel erred in releasing Appellant's written statement. First, defense counsel's declaration of intent to submit the exhibit as Appellant's unsworn statement establishes that the statement was <u>not</u> privileged in the first place.  Moreover, even assuming the statement was privileged, it is clear from the record that Appellant himself waived the privilege, as well as impliedly authorized defense counsel to waive the privilege and release the statement on Appellant's behalf.  For these reasons, I respectfully dissent from the majority's resolution of Issue I.

A. <u>Attorney-Client Privilege and Appellant's Statement</u>

It is well-established that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client

. . . ."[1]  Moreover, "[e]vidence of a statement or other
disclosure of privileged matter is not admissible against the
holder of the privilege if disclosure was compelled erroneously or
was made without an opportunity for the holder of the privilege to
claim the privilege."[2]  "The privilege is intended to encourage
'full and frank communication between attorneys and their clients
and thereby promote broader public interests in the observance of
law and the administration of justice.'"[3]

Nevertheless, it is equally well-established that material
is not privileged if it is intended to be disclosed to a third
party.[4]  In United States v. Grill,[5] this Court championed the
accused's right to make an unsworn statement pursuant to the
Rules for Courts-Martial 1001(c)(2)(C)[hereinafter R.C.M.].  In
keeping with Grill, the United States Air Force promulgated Air
Force Rule 3.1(D) on May 1, 2000, requiring that the defense
give the Government at least three days' notice of intent to
submit an unsworn statement.  Although this rule has since been

---

[1] Military Rule of Evidence 502(a) [hereinafter M.R.E.].

[2] M.R.E. 511(a).

[3] Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998)
(quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)).

[4] See, e.g., Cavallaro v. United States, 284 F.3d 230, 246-47
(1st Cir. 2002)("Generally, disclosing attorney-client
communications to a third party undermines the privilege.").

[5] 48 M.J. 131 (C.A.A.F. 1998).

repealed, it was in effect at the time of Appellant's court-martial, and, accordingly, defense counsel in this case presumably gave the Government the required notice of his intent to submit an unsworn statement on Appellant's behalf. In making this required disclosure, defense counsel displayed his and Appellant's intent to disclose the statement to a third party and, in so doing, established that the statement was not privileged.

This conclusion is further supported by Appellant's own expression of intent as to defense counsel's use of the statement. Before Appellant went absent without leave (AWOL), defense counsel extensively used Appellant's statement at trial to cross-examine Government witnesses. Appellant voiced no objection to defense counsel's use of the statement in this manner, and we may therefore reasonably assume that Appellant gave the statement to defense counsel with the full knowledge and intent that the statement would, in a manner left to defense counsel's discretion, be released at trial. Having done so in the first place, Appellant cannot now claim that attorney-client privilege should have prevented the statement's release.

   B.   Appellant's Waiver of the Statement's Privilege

   Even assuming the statement was privileged, it is well established that an accused may waive the attorney-client privilege.  If an accused "testif[ies] voluntarily concerning a privileged matter or communication . . . [the accused] waive[s] a privilege to which he or she may be entitled pertaining to the confidential matter or communication."[6]  Accordingly, I would hold that when Appellant "voluntarily testifies about a significant part of the matters contained in" the released statement, he waived any future challenge to the statement's release on the grounds that defense counsel violated the attorney-client privilege.[7]  In this vein, as noted above, the record is clear that defense counsel further used the statement's content in his cross-examination of Government witnesses.  Appellant was present at these points in the trial, yet voiced no objections to defense counsel's use of the "privileged" statement.

   Even assuming Appellant did not himself waive the attorney-client privilege, "[e]xcept to the extent that the client's

---

[6] M.R.E. 510(b).  See also United States v. Smith, 33 M.J. 114, 118 (C.M.A. 1991)(observing that "an accused who testifies about matters discussed in a privileged communication, rather than disclosing an actual portion of the privileged communication, waives the privilege").

instructions or special circumstances limit that authority, a lawyer is impliedly authorized to make disclosures about a client when appropriate in carrying out the representation."[8] The facts of the instant case present exactly one such circumstance. As the lower court aptly noted in its unpublished opinion, "[A]fter he went AWOL, the appellant left his trial counsel with the unquestionably difficult position of having to decide what, if anything, to offer as an unsworn statement during the sentencing party of the appellant's court-martial."[9] Facing this circumstance, trial defense counsel certainly had the implied authority to submit on Appellant's behalf otherwise privileged matters in an effort to defend Appellant as successfully as possible. Additionally, Appellant, by his own

---

[7] United States v. Marcum, No. ACM 34216, slip op. at 5 (A.F. Ct. Crim. App. 2002)(presenting a finding of fact in accordance with Article 66(c)).

[8] ABA Model Rules of Prof'l Conduct Rule 1.6 cmt 5 (2004 ed.)(mirrored by Air Force Rule of Prof'l Conduct 1.6); see also United States v. Province, 45 M.J. 359, 362 (C.A.A.F. 1996)(holding that counsel's disclosure of information relinquished to him by the client was "impliedly authorized" by the client); Stephen A. Salzburg et al., Federal Rules of Evidence Manual § 501.02[5][k][ii] (8th ed. 2002); John Henry Wigmore, Evidence in Trials at Common Law § 2326 at 633 (McNaughton ed. 1961). This implied authority is consistent with counsel's duty to act at all times in a client's best interest. See United States v. Godshalk, 44 M.J. 487, 492 (C.A.A.F. 1996)(noting that some disclosures by an attorney do not breach the attorney-client privilege if the attorney is acting in the client's best interest).

[9] Marcum, No. ACM 34216, slip op. at 6.

misconduct, forfeited any right to object to counsel's use of the statement.

II.  Appellant's Conviction of Non-Forcible Sodomy in Light of Lawrence v. Texas

As to Issue III, I agree with the majority's conclusion that Appellant's conviction should not be reversed under Lawrence v. Texas.[10]  But I disagree with the majority's assumption that Appellant's conduct falls within the protected liberty interest enunciated in Lawrence.  There are factual distinctions between the petitioners' offense in Lawrence and Appellant's offense in the case at bar.  Because of these significant differences, I would hold that this is not a Lawrence case and would reserve for another day the questions of whether and how Lawrence applies to the military.  The factual differences between Lawrence and Appellant's case are striking. The offense of sodomy with which the petitioners in Lawrence were charged occurred in the context of a consensual, adult relationship.  The Court noted at the outset of its opinion that at the time of their arrest, the petitioners in Lawrence were in Mr. Lawrence's apartment, engaging in a private, consensual sexual act.[11]  The Court reiterated this factual context shortly thereafter: "The petitioners were adults at the time of the

_____

[10] 539 U.S. 558.

6

alleged offense. Their conduct was in private and consensual."[12]

At the conclusion of its opinion, the Court once again emphasized the specific factual context of the petitioners' acts:

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.[13]

Indeed, the nature of the petitioners' relationship as described by the Court was central to the Court's conclusion that the State may not curtail the petitioners' "'intimate and personal choices [which are] central to [their] personal dignity and autonomy.'"[14]

The facts surrounding Appellant's offense are strikingly different. Appellant, a noncommissioned officer, was convicted, in pertinent part, of non-forcible sodomy with Senior Airman H, whom Appellant supervised in his work unit. Appellant was not involved in a romantic relationship with Senior Airman

---

[11] Id. at 564.

[12] Id.

[13] Id. at 578.

7

H, as were the petitioners in Lawrence_____.  On the contrary, Appellant's offense occurred after a night of drinking when Senior Airman H "crashed" on Appellant's couch, wearing only boxer shorts and a T-shirt, and awoke to find Appellant performing oral sex on him.  Senior Airman H testified that he did not protest Appellant's action for fear of how Appellant would respond.  This event followed two other incidents of sexual contact between Appellant and Senior Airman H, which involved touching and dancing, on evenings when Appellant and Senior Airman H had been out drinking and socializing.

Clearly, Appellant's offense occurred in the context of a casual relationship with a subordinate airman who testified that he was too frightened to protest.  This is a far cry from the consensual adult relationship, born of intimate and personal choice, which characterized the petitioners' behavior in Lawrence.  Indeed, Appellant's offense concerned precisely what the Supreme Court stated Lawrence did not concern: an individual, Senior Airman H, who might have been coerced, in a situation where consent might not easily have been refused, given Senior Airman H's subordinate professional position.  Senior Airman H himself expressed his fear of

---

[14] Id. at 574 (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. at 833, 851 (1992)).

rejecting a superior, noncommissioned officer, who was in fact his supervisor at work.  This case certainly did not involve "two adults [who acted] with full and mutual consent from each other."  In sum, the act for which Appellant was convicted in specification 1 of Charge II was not the kind of mutual and intimate act in the context of which the Supreme Court decided Lawrence.

An enumerated punitive Article within the UCMJ, Article 125 provides:

> (a) Any person subject to this chapter who engages in unnatural carnal copulation with another person of the same or opposite sex or with an animal is guilty of sodomy.  Penetration, however slight, is sufficient to complete the offense.
>
> (b) Any person found guilty of sodomy shall be punished as a court-martial may direct.[15]

Article 36 authorizes the President to prescribe "modes of proof[] for cases arising under" the punitive Articles "which shall . . . apply the principles of law and the rules of evidence[.]"[16]  Thus, although Article 125 outlines the general parameters of the sodomy offense in the military, the charge and findings in each case describe the specific manner in which Article 125 was violated, pursuant to Article 36.  Certainly, the modes of proof described in the charge and findings of an

---

[15] Article 125, UCMJ, 10 U.S.C. § 925 (2000).

[16] Article 36, UCMJ, 10 U.S.C. § 836 (2000).

9

Article 125 case may differ substantially from case to case. For this reason, I will consider Article 125 only to the extent it proscribes the conduct for which Appellant was charged and convicted, as described in the charge and findings under specification 1 of Charge II.[17]

Unlike the petitioners in Lawrence, who were both charged with, and convicted of, consensual sodomy without any evidence of force, Appellant was charged with three specifications of sodomy "by force and without consent" under Article 125 (Charge II). These charges were based on probable cause that Appellant committed the general offense described in Article 125 with the added element of force.[18] Congress has dictated that even if an accused is found not guilty of the offense as charged, the accused may, in the alternative, be found guilty "of an offense necessarily included in the offense charged[.]"[19] Accordingly, the military judge instructed the members on the lesser included offenses available for each of the three specifications under the forcible sodomy charge, including non-forcible sodomy,

---

[17] See Parker v. Levy, 417 U.S. 733, 760 (1974)(noting the Court's repeated reluctance to strike down a statute in its entirety when there are a number of situations to which it might otherwise be constitutionally applied).

[18] See R.C.M. 307(b)(2) (outlining the prerequisites for bringing the charges against an accused); United States v. Miller, 33 M.J. 235, 237 (C.M.A. 1991)(finding that R.C.M. 307(b)(2) implicitly requires probable cause to support charges against an accused).

attempted forcible sodomy, assault with the intent to commit

sodomy, indecent assault, and assault consummated by a battery.

The members ultimately convicted Appellant of non-forcible

sodomy (specification 1), forcible sodomy as charged

(specification 2), and assault consummated by a battery

(specification 3).

In reference to specification 1, which Appellant challenges

on appeal, the judge instructed the members on the lesser-

included offense of non-forcible sodomy specifically as follows:

> The offense charged, forcible sodomy, and the lesser
> included offense of non-forcible sodomy differ
> primarily in that the offense charged requires, as an
> essential element, that you be convinced beyond a
> reasonable doubt that the act of sodomy was done by
> force and without consent of Senior Airman H,
> whereas, the lesser included offense does not include
> such an element.

(Emphasis added.) As noted above, the members found Appellant

guilty of this lesser-included offense, instead of the

specification as charged. Appellant now argues that this

conviction of non-forcible sodomy was essentially a conviction

of consensual sodomy. On the contrary, I would conclude that

although the finding of non-forcible sodomy was not a conviction

of the charged offense of forcible sodomy, neither did it

establish consent. Unlike Lawrence, in which there was no

evidence of force whatsoever, the finding in this case simply

---

[19] Article 79, UCMJ, 10 U.S.C. § 879 (2000).

showed that the members were not convinced <u>beyond a reasonable doubt</u> that the act of sodomy was done by force and without consent – in other words, that the evidence of force was simply insufficient.[20]  This finding did not negate the probable cause of force that supported Appellant's charge, nor did it establish consent.  Indeed, Appellant did not, prior to trial, move to dismiss or amend the forcible sodomy charge for lack of evidence of force.

Given this factual context of Appellant's charge, it is obvious why this is not a <u>Lawrence</u> case.  The following diagram demonstrates what this case is truly about.  On the far left is the purely consensual case as in <u>Lawrence</u>; on the far right is a case with a conviction for forcible sodomy beyond a reasonable doubt.  This case falls in the middle because there was probable cause to believe that Appellant had committed forceful sodomy.  R.C.M. 302(c).



**Probable
Cause**

**Lawrence**

**Prove Force
beyond
reasonable
doubt**

---

[20] <u>See Ex Parte Taylor</u>, 101 S.W.3d 434, 447 n.3 (Tex. Crim. App. 2002) (Hervey, J., dissenting)(distinguishing a general verdict of acquittal from a verdict of not guilty due to insufficient evidence).

In short, one does not need to go beyond the facts of this case and the language of the Lawrence opinion to conclude that Appellant's conduct did not fall within the liberty interest set forth in Lawrence. Certainly this case is factually distinguishable from Lawrence because it does not "involve two adults, who with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle."[21] Further, Appellant was a senior noncommissioned officer who supervised and rated the victim. Thus, the victim was not in a position where "consent might . . . easily be refused."[22] And finally, to this date, the parties have not contested probable cause to believe that Appellant committed forcible sodomy.

For these reasons, I concur in the result as to Issue III.

---

[21] Id.

[22] 539 U.S. at 578.